Marian F. Harrison
US Bankruptcy Judge

Dated: 3/11/2014

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO. 313-06325 |
| CUMBERLAND CORRAL, LLC, ) | |
| ) | JUDGE MARIAN F. HARRISON |
| Debtor. ) | |
| ) | CHAPTER 11 |
| ) | |

_____

## MEMORANDUM OPINION
_____

This matter is before the Court upon the motion for relief from the automatic stay filed by Golden Corral Franchising Systems, Inc. (hereinafter "GCFS") and Golden Corral Corporation (hereinafter "GCC" and collectively with GCFS as "Golden Corral") to permit Golden Corral to terminate the Debtor's Franchise Agreements set out below.

For the following reasons, which represent the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 7052, and made applicable by Fed. R. Bankr. P. 9014(c), the Court finds that the motion for relief should be denied.

# I.  BACKGROUND

1.  The Debtor is currently the franchisee with respect to two currently operational GOLDEN CORRAL® restaurants: (1) Restaurant # 2562, located at 315 Old Lebanon Dirt Road, Hermitage, Tennessee 37076 (hereinafter "Hermitage Restaurant"); and (2) Restaurant # 2493, located at 2811 Wilma Rudolph Boulevard, Clarksville, Tennessee 37040 (hereinafter "Clarksville Restaurant").

2.  The Debtor operates the Hermitage Restaurant pursuant to a Franchise Agreement (hereinafter "Hermitage Franchise Agreement"), dated June 2, 2006, between GCFS and the Debtor.

3.  The Debtor operates the Clarksville Restaurant pursuant to a Franchise Agreement, dated December 12, 2003, between GCFS and George G. Keith and an Addendum (hereinafter "Clarksville Franchise Agreement").  The Clarksville Franchise Agreement was assigned to the Debtor pursuant to an Assignment of Franchise Agreement, dated February 10, 2004, between Mr. Keith and the Debtor (hereinafter "Clarksville Assignment") and certain related agreements.

4.  The Debtor had a third GOLDEN CORRAL® restaurant, Restaurant # 2520, located at 3020 Mallory Lane, Franklin/Cool Springs, Tennessee 37067 (hereinafter "Franklin Restaurant").  However, the Debtor failed to perform mandatory remodeling and later ceased to operate the Franklin Restaurant, therefore, defaulting under the Franklin Franchise Agreement, dated May 18, 2004.  The Debtor concedes that it is in default and intends to reject the Franklin Franchise Agreement to the extent it remains an executory contract.

5.  Section VI of the Franchise Agreements sets out the duties of the Debtor, including:

> F.  Franchisee shall meet and maintain the highest health standards and ratings applicable to the operation of the restaurant . . . .
>
> G.   Franchisee shall operate the restaurant in strict conformity with such methods, standards, specifications, systems and procedures as Franchisor may from time to time prescribe in the Manuals or otherwise in writing to insure that the highest degree of quality and service is maintained . . . .

6.  Section XIV of the Franchise Agreements sets out the default and termination provisions, in relevant part:

3 - U.S. Bankruptcy Court, M.D. Tenn.

B.   Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events;

*  *  *  *

8.  If Franchisee is declared in default by Franchisor under any provision of any other franchise agreement between the parties, any amendment thereof or successor thereto, or is in default of any provision of any sublease agreement, equipment purchase agreement, any promissory note (a) with Franchisor or an affiliate or (b) to which franchisor or any affiliates is a guarantor, or any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates;

9.  If Franchisee, after either (i) curing a default under this Agreement pursuant to a Notice of Termination; or (ii) after receipt of any other writing from Franchisor advising Franchisee that a default occurred regardless of whether such writing constituted a Notice of Termination, commits another default under this Agreement within 24 months following the earlier default;

10.  If an imminent threat or danger to the public health or safety results from the operation of the restaurant.

*  *  *  *

C.  Except as provided in Sections XIV.A. and XIV.B. of this Agreement, Franchisee shall have thirty (30) days after its receipt from Franchisor of a written Notice of Termination within which to remedy any default hereunder and provide evidence thereof to Franchisor. . . . Such

4 - U.S. Bankruptcy Court, M.D. Tenn.

defaults shall include, for example, without limitation, the occurrence of any of the following events:

* * * *

2. If Franchisee fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing . . . .

7. Golden Corral, through the expenditure of time, skill, effort, and money, has developed a unique system (hereinafter the "GC System") for owning and operating family-oriented, buffet-style restaurants.

8. The distinguishing characteristics of the GC System include, without limitation, the establishment, development, and operation of a family restaurant which features a wide variety of meals, in-store bakery items, and other food and beverage items for lunch, dinner, weekend breakfast, and snacks with an emphasis on prompt, courteous service in a clean, wholesome, family-oriented atmosphere; distinctive exterior and interior design and trade dress; high standards and specifications for materials, equipment, furnishings, fixtures, supplies, signage, and food and beverage items; operating procedures for sanitation and maintenance; special procedures for food and beverage preparation and service; training and assistance; and methods and

techniques for inventory and cost controls, record-keeping and reporting, purchasing, customer service, sales promotion, and advertising.

9.   The GC System is identified by certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including but not limited to the mark "GOLDEN CORRAL" and other trade names, service marks, and trademarks for use in connection with the GC System (collectively, the "Proprietary Marks").

10.   In addition to the registration of the Proprietary Marks with the United States Patent and Trademark Office, Golden Corral has acquired common law rights with respect to the Proprietary Marks based on their use by GCC, GCFS, and their franchisees.

11.   Golden Corral has invested substantial sums advertising, marketing, and promoting goods and services under the GC System.  As a result, the consuming public has come to recognize, and does recognize, the Proprietary Marks as being used by Golden Corral, and to associate and identify the Proprietary Marks with Golden Corral. The Franchise Agreements granted the Debtor non-exclusive rights to operate restaurants using the GC System, including the Proprietary Marks.

6 - U.S. Bankruptcy Court, M.D. Tenn.

12. To preserve the value of its Proprietary Marks, Golden Corral requires its franchisees to meet and maintain the highest levels of sanitation and cleanliness in their restaurants.

13. Golden Corral employs nine quality assurance directors who are assigned to nine geographic sectors throughout the country. On a quarterly basis, these directors make unannounced visits to franchise restaurants for the purpose of conducting a quality inspection. These directors document their inspection findings on a form known as a Cleanliness, Service, Quality (hereinafter "CSQ") Form, which documents a CSQ score.

14. The CSQ Form consists of four components: hospitality, food quality, food safety, and cleanliness. CSQ inspections assign point values to the various criteria and express scores on a percentage basis for each of the components as well as a "total" score that reflects the total of all points lost on a CSQ versus the total score on the CSQ.

15. According to Golden Corral, it has a policy that establishes a "threshold" score that must be achieved to pass a CSQ inspection.

16.  Prior to December 1, 2012, a franchise location passed a CSQ inspection with a threshold "total" score of 71%.

17.  Effective December 1, 2012, Golden Corral changed the threshold scores that must be achieved to pass a CSQ inspection.  Specifically, a franchise location had to achieve a "total" score of 75% and a "food quality" score of 67% to pass a CSQ inspection.

18.  Prior to and after December 1, 2012, if a franchise location failed a CSQ inspection, Golden Corral would re-inspect the franchise location twice during a 60-day period.  During the re-inspection, Golden Corral would apply the threshold that was in place at the time of the original inspection.  For example, if a franchise location failed a CSQ inspection prior to December 1, 2012, by failing to achieve a "total" score of 71%, and was re-inspected after December 1, 2012, then the 71% threshold would apply to the re-inspection.

19.  This occurred in connection with the December 26, 2012, CSQ inspection of the Hermitage Restaurant.  The December inspection was a reinspection of a CSQ failure that occurred at the Hermitage Restaurant on October 16, 2012.  The December

reinspection resulted in a "total" score of 76.9%, which represented a passing score both prior to and after December 1, 2012. However, the food quality score was 61%, which was a failing score under the standard in place as of December 1, 2012.

20. Because the October 16, 2012, CSQ inspection occurred prior to December 1, 2012, Golden Corral admits the December reinspection should have applied the standard in place prior to December 1, 2012.

21. However, Golden Corral did not apply the pre-December 1, 2012, standards to the December reinspection, finding that the Debtor failed the December inspection because the food quality score was less than 67%, the standard applied after December 1, 2012.

22. The testimony of Robert M. McDevitt, Senior Vice President of Franchising for Golden Corral (hereinafter "Mr. McDevitt"), confirmed that the December 26, 2012, inspection was the second reinspection after the Hermitage Restaurant failed its CSQ inspection on October 16, 2012, and that the standards applied would be the standards in effect at the time of the original inspection. Thus, the Hermitage

Restaurant passed the December 26, 2012, inspection under the standards in effect at the time of the October 16, 2012, CSQ inspection.

23.    Based on the CSQ Forms, the Debtor passed the following CSQ inspections:[1]

a. Hermitage Restaurant:

i. March 21, 2012
(overall CSQ score 85.6%; food quality score 87.7%)

ii. August 18, 2012
(overall CSQ score 88.5%; food quality score 87.2%)

iii. November 20, 2012
(overall CSQ score 84.4%; food quality score 82.1%)

iv. December 26, 2012
(overall CSQ score 76.9%; food quality score 61.0%)

v. January 29, 2013
(overall CSQ score 81.5%; food quality score 72.3%)

vi. May 10, 2013
(overall CSQ score 86.5%; food quality score 88.2%)

vii. August 18, 2013
(overall CSQ score 76.0%; food quality score 67.4%)

---

[1]Proof was presented regarding CSQ inspections at the Franklin Restaurant, but because the Franklin Restaurant has already closed, the Court finds that such evidence is not relevant to this motion, as discussed below.

viii. September 19, 2013
(overall CSQ score 76.7%; food quality score 68.3%)

ix. October 18, 2013
(overall CSQ score 81.3%; food quality score 69.1%)

x. January 13, 2014
(overall CSQ score 84%; food quality score 81.3%)

b. Clarksville Restaurant:

i. March 21, 2012
(overall CSQ score 79.2%; food quality score 71.8%)

ii. August 18, 2012
(overall CSQ score 78.3%; food quality score 65.6%)

iii. October 17, 2012
(overall CSQ score 76.7%; food quality score 64.1%)

iv. March 9, 2013
(overall CSQ score 81.3%; food quality score 71.3%)

v. April 9, 2013
(overall CSQ score 86.3%; food quality score 69.7%)

vi. May 9, 2013
(overall CSQ score 79.0%; food quality score 69.7%)

vii. August 18, 2013
(overall CSQ score 88.8%; food quality score 84.3%)

viii. September 22, 2013
(overall CSQ score 89.0%; food quality score 82.6%)

ix. January 13, 2014
(overall CSQ score 87.3%; food quality score 83.0%)

24.  Based on the CSQ Forms, the Debtor failed the following CSQ inspections, none of which occurred post-petition:

a. Hermitage Restaurant:

>i.  January 20, 2011
>(overall CSQ score 66.7%; food quality score 67.7%)
>
>ii. October 16, 2012
>(overall CSQ score 54.6%; food quality score 39.5%)
>
>iii. July 13, 2013
>(overall CSQ score 70.6%; food quality score 60.0%)

b. Clarksville Restaurant:

>i.  January 20, 2011
>(overall CSQ score 52.5%; food quality score 39.0%)
>
>ii. July 29, 2011
>(overall CSQ score 69.2%; food quality score 62.1%)
>
>iii.  September 8, 2011
>(overall CSQ score 59.8%; food quality score 30.3%)
>
>iv.  January 28, 2013
>(overall CSQ score 60.0%; food quality score 46.2%)

25.  Golden Corral policy addresses CSQ inspection failing scores as follows:

a. One failure in a rolling 12-month period results in a default warning letter.

b. Two failures in a rolling 12-month period result in a default notice with 30 days to cure.

c. Three failures in a rolling 12-month period result in a default with no opportunity to cure.

26. After the Hermitage Restaurant failed its CSQ inspection on October 16, 2012, Golden Corral issued a letter, dated October 17, 2012, in accordance with its policy after one CSQ failure.

27. After the Clarksville Restaurant and Franklin Restaurant had CSQ inspection failures on January 28, 2013, and February 25, 2013, respectively, Golden Corral issued a letter, dated March 5, 2013, in accordance with its policy after two CSQ failures in a 12-month rolling period. In this letter, Golden Corral referenced Section XIV.B.9 and XIV.B.10, stating it could "elect to terminate any or all of the Franchise Agreements upon the occurrence of any other default of any kind, including but not limited to a default for failure to meet the required standards as reflected through CSQ or food quality scores, within the next twenty-four (24) months."

28. After the Hermitage Restaurant failed its CSQ inspection on July 13, 2013, Golden Corral attempted to terminate the Debtor's Franchise Agreements by letter dated July 23, 2013.

29. Golden Corral's basis for termination of all three franchises was multiple and repeated defaults with regard to the operation of the three restaurants. The letter referenced the March 5, 2013, letter and the failed CSQ inspections at the Clarksville Restaurant on May 9, 2013, and at the Hermitage Restaurant on July 13, 2013.

30. Golden Corral did not present any evidence that it had been financially harmed as a result of the Debtor's actions, but Mr. McDevitt testified that the Debtor's low scores were harmful to Golden Corral's good name and Proprietary Marks.

31. According to the testimony of Shelly C. McCormick, director of operations for the Debtor, quality assurance procedures have been initiated post-petition to ensure that the Debtor remains compliant with Golden Corral requirements going forward. Specifically, the Debtor has quality assurance individuals who take temperatures of food products, confirm food is prepared according to recipe, and assist managers to ensure procedures are followed.

32.  The Debtor has continued to employ approximately 215 employees and to operate in accordance with an approved budget.

## II.  ARGUMENTS

### A.  GOLDEN CORRAL

Golden Corral asserts that cause for relief from the automatic stay has been established under 11 U.S.C. § 362(d)(1).  First, Golden Corral asserts that the Debtor has failed to adequately protect Golden Corral's interests in the Proprietary Marks as well as its other interests.  Golden Corral bases this argument upon the Debtor's failed CSQ Inspections at all three locations during the 31 months prior to the petition date and points to the Hermitage Restaurant's failed CSQ Inspection on July 13, 2013, after receiving written notification that any additional failure would result in termination of that agreement.

Second, in the alternative, Golden Corral asserts that cause exists because the Debtor is incapable of assuming the Hermitage Franchise Agreement due to the Debtor's incurable, nonmonetary default based on the failed July 13, 2013, CSQ

Inspection.[2]  Golden Corral further argues that the Debtor's defaults under both the Hermitage Franchise Agreement and the Franklin Franchise Agreement result in an incurable, nonmonetary default under the Clarksville Franchise Agreement due to the "cross-default" provisions in the Franchise Agreements.

Third, in the alternative, Golden Corral submits that cause exists because the Debtor is precluded by applicable law from assigning, and by extension, assuming the Franchise Agreements.

## B.  DEBTOR

The Debtor argues that Golden Corral has failed to carry its burden because its stated basis for terminating the Franchise Agreements does not exist.  Specifically, the Debtor points out that Golden Corral sought to terminate the Franchise Agreements solely because the Hermitage Restaurant failed three CSQ inspections during a rolling 12-month period. However, upon further examination of the December reinspection, Mr. McDevitt admitted that the Debtor did not have three failures.  Accordingly, the

---

[2]Golden Corral also makes the argument that the Franklin Franchise Agreement cannot be assumed, however, this issue is moot.  The Debtor has already conceded that it defaulted under the Franklin Franchise Agreement and is not seeking to assume such agreement.

Debtor asserts that Golden Corral cannot now argue that the Hermitage Restaurant's failed July 13, 2013, CSQ inspection was incurable and therefore constitutes cause for relief from the automatic stay.

In addition, the Debtor submits that Golden Corral has failed to show that it has been financially harmed as a result of the Debtor's actions, that the Debtor has failed any health department inspections, that the Debtor has misused any of Golden Corral's Proprietary Marks, or that the Debtor has defaulted on any monetary obligations owed to Golden Corral. Moreover, even if the Court found that Golden Corral had carried its burden of an initial showing of cause, the Debtor asserts that it has sufficiently proven that Golden Corral's interests are adequately protected. Specifically, the Debtor has passed all post-petition CSQ inspections, it has instituted measures that are designed to ensure compliance with Golden Corral policies and procedures, and it has remained current on all amounts owed to Golden Corral.

The Debtor further argues that the cross-default provision in the Franchise Agreements should not be enforced, and instead, each Franchise Agreement should be considered separately. Finally, the Debtor asserts that because it has no intent to assign the Franchise Agreements, whether it could assign the Franchise Agreements under

applicable law should be irrelevant as to whether it can assume the Franchise Agreements.

### III. DISCUSSION - 11 U.S.C. § 362(d)(1)

Pursuant to 11 U.S.C. § 362(d)(1), the Bankruptcy Court "[o]n request of a party in interest and after notice and a hearing . . . shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."

"As used in § 362(d)(1), the term 'cause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re Indian River Estates, Inc.,* 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003) (citation omitted). "'In determining whether cause exists, the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code.'" *In re Plastech Eng'rd Prods. Inc.,* 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) (citation omitted). Cause is not defined in the Code, and therefore, "courts must determine whether discretionary relief is appropriate

on a case-by-case basis." *Laguna Assoc. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assoc. Ltd. P'ship)*, 30 F.3d 734, 737 (6th Cir. 1994) (citation omitted).

The party seeking relief bears the initial burden of making a prima facie case of "cause" for relief under 11 U.S.C. § 362(d)(1). *In re Cambridge Woodbridge Apts., L.L.C.,* 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003). The Debtor bears the ultimate burden on all other issues except for those relating to equity in property. 11 U.S.C. § 362(g).

## A. <u>FAILURE TO ADEQUATELY PROTECT</u>

The Court finds that Golden Corral has failed to carry its burden to show that the Debtor has failed to adequately protect its Proprietary Marks and other interests at either the Hermitage Restaurant or the Clarksville Restaurant.

The first letter Golden Corral sent to the debtor was dated October 17, 2012, and related to the October 16, 2012, failed CSQ inspection at the Hermitage Restaurant. The letter clearly states Golden Corral's CSQ policy that three or more CSQ evaluation scores below the required operating standard within a rolling 12-month period will constitute a default for which no opportunity to cure may be available. The letter does

19 - U.S. Bankruptcy Court, M.D. Tenn.

not reference the other two restaurants or Sections XIV.B.8 or XIV.B.9 of the Franchise Agreements.

On March 5, 2013, Golden Corral sent another letter to the Debtor, referencing failed CSQ inspections at the Franklin Restaurant and the Clarksville Restaurant. The letter states that if these locations fail on reinspection to achieve the required minimum scores, the Franchise Agreements will be terminated without further opportunity to cure. Referencing the Franchise Agreements, Golden Corral states that the Hermitage Restaurant is in default pursuant to the cross-default provision (Section XIV.B.8). The letter does not reference Golden Corral's CSQ policy. Instead, the letter indicates that if there is any future default within 24 months, Golden Corral may elect to terminate all the Franchise Agreements, presumably pursuant to Section XIV.B.9. The final letter, sent post-petition, referenced the March 5, 2013, letter, the failed CSQ inspection at the Clarksville Restaurant on May 9, 2013, and the failed CSQ inspection at the Hermitage Restaurant on July 13, 2013.

Golden Corral set up a system of inspections with a CSQ policy that explains what standards are expected of Franchisees. The CSQ policy sets out a procedure whereby it takes three CSQ inspection failures in a rolling 12-month period to

constitute an incurable default. This is consistent with Section XIV.C.2 of the Franchise Agreements, under which a failure to "maintain any of the standards or procedures prescribed in . . . writing. . . ." constitutes a default. However, in the March 5, 2013, letter, Golden Corral cites to the Franchise Agreements' catch-all provision that allows Golden Corral to terminate a Franchise for any default within 24 months of being given notice and applies this to all the Franchises through the cross-default provision.

Neither the Clarksville Restaurant nor the Hermitage Restaurant have had three failed CSQ inspections in a rolling 12-month period. Under Golden Corral's CSQ policy, both of these locations still should have had the opportunity to cure their failed CSQ inspections and in fact, both have continued to pass the CSQ inspections since the July 13, 2013 failed CSQ inspection.

Golden Corral has also failed to show that it has been financially harmed as a result of the Debtor's actions, that the Debtor has failed any health department inspections, that the Debtor has misused any of Golden Corral's Proprietary Marks, or that the Debtor has defaulted on any monetary obligations owed to Golden Corral.

Finally, even if the Court were to find that Golden Corral had carried its burden of an initial showing of cause, the Debtor sufficiently proved that Golden Corral's interests are now adequately protected. Specifically, the Debtor has passed all post-petition CSQ inspections, it has instituted measures that are designed to ensure compliance with Golden Corral policies and procedures, and it has remained current on all amounts owed to Golden Corral. These facts demonstrate that Golden Corral's interests are adequately protected and that relief from the automatic stay is not warranted.

## B. ASSUMPTION OF EXECUTORY CONTRACTS

It is undisputed that the Franchise Agreements are executory contracts within the meaning provided in 11 U.S.C. § 365. If the Debtor is not able to assume the Hermitage Franchise Agreement or the Clarksville Franchise Agreement, then Golden Corral would be entitled to relief. As discussed below, the Court finds that both Franchise Agreements can be assumed.

### 1. Assumption v. Assignment

Under 11 U.S.C. § 365(c), a debtor-in-possession or trustee "may not assume or assign any executory contract or unexpired lease of the debtor . . . if *applicable law*

excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . . and such party does not consent to such assumption or assignment." (Emphasis added). Golden Corral urges the Court to interpret 11 U.S.C. § 365(c) to mean that where a debtor cannot assign a contract, it cannot assume it either. This is known as the "hypothetical" test.

Courts are split on how to interpret this section. The majority of circuit courts have followed the hypothetical test, interpreting 11 U.S.C. § 365(c) to mean that where "applicable law" bars assignment of the underlying agreement, both assumption and assignment are prohibited. *See, e.g., Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.),* 165 F.3d 747, 754-55 (9th Cir. 1999); *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.),* 361 F.3d 257, 271 (4th Cir. 2004); *City of Jamestown, Tenn. v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534, 537 (11th Cir. 1994); *In re West Elecs. Inc.*, 852 F.2d 79, 83 (3rd Cir. 1988). Under this test, "a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party." *Catapult,* 165 F.3d at 750

(citations omitted).  *See also In re Kazi Foods of Michigan, Inc.,* 473 B.R. 887, 890

(Bankr. E.D. Mich. 2011) (debtor cannot assume franchise agreements without

franchisor's consent where applicable law prohibits assignment).


A minority of circuit courts have applied what is known as the "actual" test. [3]

Under the actual test, the court conducts a case-by-case inquiry into whether the debtor

intends to assign the executory contract.  Accordingly, if assignment is not

contemplated, the applicable law cannot bar assumption.  *See, e.g., Institut Pasteur

v. Cambridge Biotech Corp.,* 104 F.3d 489, 493 (1st Cir. 1997) (proper inquiry is

whether debtor actually intends to assign executory contract); *Ohio Skill Games Inc.

v. Pace-O-Matic, Inc.* (*In re Ohio Skill Games Inc.),* No. 08-06049, 2010 WL

2710522, at *6 (Bankr. N.D. Ohio July 8, 2010) ("[a]llowing 'applicable law' to drive

the assumption determination, when said law may be entirely inapplicable, would allow

creditors a potential windfall through a fast exit from their duties and obligations"); *In

re Aerobox Composite Structures, LLC*, 373 B.R. 135, 142 (Bankr. D.N.M. 2007);

---

[3]As noted in *In re Footstar, Inc.,* 323 B.R. 566 (Bankr. S.D.N.Y. 2005), "the great
majority of lower courts have taken the view that the courts should apply an 'actual test' in
construing the statutory language so as to permit assumption where the debtor in possession
in fact does not intend to assign the contract."  *Id.* at 569 (collecting cases at n. 2).

*In re Edison Mission Energy,* No. 12-49219, 2013 WL 5220139, at \*10 (Bankr. N.D. Ill. Sept. 16, 2013).

Neither the Sixth Circuit Court of Appeals nor the United States Supreme Court have ruled on this issue. ***But see N.C.P. Mktg. Group, Inc. v. BG Star Prods., Inc.,*** 556 U.S. 1145 (2009) (denying certiorari but recognizing division in courts on issue).

In the present case, there is no dispute that the Franchise Agreements, by their terms, do not allow assignment without Golden Corral's consent. However, the Debtor has no intention of assigning the Franchise Agreements, and assumption would maintain the parties' relationship under the Franchise Agreements. In other words, allowing the Debtor to assume the Franchise Agreements is not forcing Golden Corral to accept performance from some unknown third party. Instead, assumption would maintain the parties' relationship under the Franchise Agreements.

Under these circumstances, the Court is persuaded by the reasoning of those courts that have adopted the actual test. To allow Golden Corral to block assumption of the Franchise Agreements because such agreements could not be assigned would allow Golden Corral a windfall while destroying the Debtor's chances at

reorganization. Such an outcome would be contrary to the purposes of the Bankruptcy Code.

Accordingly, the Court finds that the Debtor's inability to assign the Franchise Agreements does not bar it from assuming the Hermitage Franchise Agreement and the Clarksville Franchise Agreement.

## 2. <u>Curing of Defaults</u>

The Court has already held that the Hermitage Restaurant and the Clarksville Restaurant were not in default under Golden Corral's own policy of requiring three failed CSQ inspections in a rolling 12-month period.[4] But even if the failed pre-petition CSQ inspections constituted a default, the Court finds that 11 U.S.C. § 365(b)(2)(D) would not preclude assumption of the Hermitage Franchise Agreement or the Clarksville Franchise Agreement.

"'Where the default is non-monetary and is not curable, the debtor is precluded from assuming an executory contract only if the default was material or if the default

_____

[4]The procedures set up by Golden Corral in effect define what constitutes a default as to cleanliness, service, and quality under the Franchise Agreements.

26 - U.S. Bankruptcy Court, M.D. Tenn.

caused 'substantial economic detriment.'" *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 731 (Bankr. M.D. Fla. 2006) (citations omitted); *In re Clearwater Natural Res., LP,* No. 09-70011, 2009 WL 2208463, at *4 (Bankr. E.D. Ky. July 23, 2009) (materiality and economic significance of default is measure of whether debtor may assume a contract in which a non-curable, non-monetary default has occurred).

Here, the Debtor has continued to pass all post-petition CSQ inspections, there are no allegations related to health and safety, the Debtor has implemented a plan to ensure compliance with Golden Corral's policies, and Golden Corral has not indicated any monetary damage from the Debtor's actions. For these reasons, the Court finds that even if there were defaults under the Franchise Agreements for the Hermitage Restaurant and the Clarksville Restaurant, such defaults were immaterial and have not caused substantial economic detriment.

### 3.  Enforcement of Cross-Default Provisions

The Court finds the cross-default provision in each of the Franchise Agreements to be separate and severable.  It is well established that in order to assume a particular executory contract or unexpired lease, the debtor is "***only*** required to perform under that discrete contract or lease, not under other, substantially unrelated agreements." *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Assoc. (In re UAL Corp.),* 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006) (emphasis in original).  This rule applies where distinct and separate agreements are linked by a cross-default clause that provides for the loss of rights under one agreement if another is breached. *Id.* (citations omitted). *See also The Shaw Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.),* 350 B.R. 166, 179 (Bankr. D. Del. 2006) ("[c]ross-default provisions are 'inherently suspect' because they interfere with the debtor's rejection power") (citation omitted).


When employing the cross-default rule, courts must "determine whether agreements linked by a cross-default clause are substantially connected to one another, so that a failure to enforce the clause would deprive the nondebtor party of an essential part of its bargain." *In re UAL Corp.,* 346 B.R. at 468-69.  In *In re Szenda,* 406 B.R. 574 (Bankr. D. Mass. 2009), the court concluded that a cross-default clause linking two

franchise agreements was unenforceable where the agreements were not economically interdependent. *Id.* at 581. *See also DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.),* 402 B.R. 87, 100 (Bankr. D. Del. 2009) ("contracts are economically interdependent when the consideration underlying each contract supports *the other* contract, such that non-performance under one contract would constitute a failure of the consideration underlying *the other* contract") (emphasis in original) (citations omitted).

In the present case, the Franchise Agreements were entered into at different times, and there was no proof that consideration for any of the agreements supported another or that Golden Corral would not have entered into one of the agreements without the others. In the absence of a showing that the Franchise Agreements are economically interdependent, the Court finds that the Debtor is not prevented from rejecting the Franklin Franchise Agreement and assuming the remaining Franchise Agreements.

# IV. CONCLUSION

For the foregoing reasons, cause does not exist to lift the automatic stay and permit Golden Corral to exercise its right to terminate the Hermitage Franchise Agreement or the Clarksville Franchise Agreement. Accordingly, Golden Corral's motion for relief from the automatic stay should be denied.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.